## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

In re:

DAVID M. DECKER, and MARILYN
L. DECKER,

Debtors.

Case No. A14-00065-GS
Chapter 7

## MEMORANDUM ON UNITED STATES TRUSTEE'S
## MOTION TO CONVERT CASE TO CHAPTER 11

The United States Trustee ("UST") moves to convert this chapter 7 bankruptcy proceeding to chapter 11 pursuant to 11 U.S.C. § 706(b).[1] The UST argues that debtors David and Marilyn Decker ("Debtors") should be required to use their monthly net income to pay their creditors within a reorganization. Debtors oppose the motion. They contend that the UST impermissibly seeks to extend the "means test" found in § 707(b) to compel conversion of individual chapter 7 debtors under § 706(b). They argue that since Congress has excepted debtors whose debts are not primarily consumer debts, such as themselves, from the means test, the UST may not circumvent that statutory limitation under the discretionary conversion provisions found in § 706(b). Debtors assert they are instead entitled to remain in chapter 7 to address their significant tax debt and other financial problems. Having carefully reviewed the evidence and arguments presented, the court will exercise its discretion to convert this case to chapter 11.

---

[1] *Mot. to Convert Case to Chapter 11* (ECF No. 30), filed June 16, 2014.

## CASE BACKGROUND

**A.    History of Debtors' Financial Problems.**

Debtors filed their chapter 7 petition on March 12, 2014, to address their financial problems.  They trace those problems back to 2009 when their oldest daughter required medical treatment for severe head and neck pain.  Unfortunately, their daughter needed considerable medical treatment that left her addicted to prescription pain medication.  When her access to prescription medication ended, she turned to illegal drugs.  Mrs. Decker testified that since her daughter's initial medical problems began, much of Debtors' time and finances have been devoted to her medical problems, and, subsequently, to her recovery from addiction.  Debtors have paid for this daughter's living expenses and rehabilitation.  Additionally, Debtors say that their daughter stole substantial amounts from them to finance her addiction, further exacerbating their financial troubles.  Mrs. Decker testified that her daughter, who was 26 years old at the commencement of the case, is presently receiving treatment in Southern California.  Although she is currently doing well, Mrs. Decker explained that her daughter's recovery is a slow, daily process that will take time to complete.  Consequently, Debtors plan to continue to provide financial support for their daughter postpetition.[2]

The financial drain of assisting their daughter is only half of Debtors' financial story.  Indeed, their troubles appear to have started several years earlier.  Since 2005, the Deckers have had ongoing tax issues with the Internal Revenue Service ("IRS"), although the problem

---

[2] Mrs. Decker testified that her daughter also has psychological issues stemming from a traumatic assault that occurred when she was young.  She believes that her daughter will need their financial assistance for many years as a result of these problems.

may not have manifested itself until 2007 when the IRS assessed them with deficiencies for tax years 2005 and 2006.[3] At the evidentiary hearing, Mrs. Decker readily admitted that their tax problems were a major reason for their bankruptcy. The evidence confirms this fact. The IRS has filed Proof of Claim No. 2-1 for taxes, interest, and penalties, totaling $204,189.84. The oldest tax liabilities were assessed on January 1, 2007, for Mrs. Decker's outstanding interest owed on unpaid income taxes for tax year 2005. According to its proof of claim, the IRS has annually issued a tax assessment for one, or both, of the Deckers from 2007 through 2012.

Mrs. Decker testified that their tax problems were the result of a failure to withhold sufficient funds from substantial retirement payments she receives. However, she stated that they had always filed their tax returns. When asked why they had not corrected their tax problems sooner, given that they have continued for almost a decade, Mrs. Decker offered only that things had fallen through the cracks. She said that they were living in California and her husband had been in school. During that time, she was still working as a teacher spending as much as 12 to 14 hours on the job and commuting 50 miles each way to work. She also pointed out that they had sought help with their tax problems from a tax relief organization, although when remains unclear. According to Mrs. Decker, the agency proved to be a fraud and closed after they had paid it about $4,000.00.

---

[3] The IRS's Proof of Claim indicates that the debtors still owe $2,547.93 in interest on Mrs. Decker's 2005 taxes, and over $24,000 for outstanding taxes and interest arising from 2006. The Proof of Claim was not offered as an exhibit at the hearing. The court exercises its discretion to take judicial notice of its docket and the claims register within this case under Fed. R. Evid. 201(b). The court references the Proof of Claim for additional, and more current details, of the claim. The information in the Schedules generally matches what is reflected in the IRS's Proof of Claim, though Schedule F indicates that Debtors' tax problems extended back to 2004.

**B.      The Bankruptcy.**

In their petition, the Deckers identified their debts as primarily business debts.  Their schedules reflect total liabilities of $425,847.49.  Of this amount, $22,002.00 is attributable to secured claims for vehicle loans, although Debtors also list the IRS as a secured creditor for an uncertain amount.   Debtors list $102,283.79 in priority tax debt to the IRS.  The scheduled unsecured, nonpriority debts total $285,057.06.  Of this sum, $81,569.69 is owed to the IRS for additional taxes and interest, $15,683.14 is owed to the State of California for "California income tax liabilities," and $16,407.22 is owed to the State of Alaska, Public Advocacy for "[a]ny and all claims" in the amount of $16,407.22.[4]

For purposes of the Bankruptcy Code, the IRS tax debt is categorized as non-consumer debt.[5]  The debts owed to the State of California and to the Alaska Public Advocacy office also appear to be non-consumer debts.  These three creditors hold the majority of the Deckers' debts.  For this reason, Debtors do not have primarily consumer debts, and are excepted from the means test analysis required under § 707(b).  The UST does not challenge the characterization of Debtors' debts as primarily non-consumer in nature.

Debtors' Schedules reflect that they own no real property, but lease a house for $2,900.00 per month from a third party.  Their personal property, valued at $35,275.98, is either encumbered by liens or exempt.[6]

---

[4] *Schedule F*, ECF No. 12 at 25, 28.

[5] *IRS v. Westberry (In re Westberry)*, 215 F.3d 589, 591 (6th Cir. 2000).

[6] One exception is a listing for potential claims, value unknown, against one of Debtors' daughters for money and property that she took from them.

4

### C.    Monthly Income and Expenses.

Both debtors are in their early 60's.  Mr. Decker is employed as a physician's assistant with Conoco Phillips.  He earns $13,587.09 in monthly gross wages.  Schedule I reflects monthly payroll deductions for taxes and insurance, as well as voluntary contributions of $1,632.00 to a retirement plan, presumably with Conoco Phillips, and $1,205.04 to repay a prepetition retirement loan.  Mrs. Decker is retired and receives monthly payments from two separate pension plans totaling roughly $5,000.00.  Although Mr. Decker continues to work, he receives monthly pension payments of roughly $5,000.00 as well.  Together, they currently receive $10,298.68 per month from pensions.  Debtors, therefore, have monthly gross income of $23,855.77, which is reduced to $17,452.43 by mandatory and voluntary payroll deductions.

Debtors claim $17,582.32 in monthly expenses, leaving them with a negative $129.89 per month in net income.  Most significantly, they claim $3,743.00 in vehicle payments per month.  Additionally, they include $1,000.00 per month for payments on "non-dischargeable tax obligations," and $3,525.00 in payments to support their adult children and Mr. Decker's mother, who lives with them.[7]

The UST challenges most of the deductions and expenses discussed above, and several others, as inaccurate or inappropriate.  During the hearing, Mrs. Decker conceded that several expenses were too high, or inaccurate.  Specifically, she agreed that the monthly health insurance payments in the amount of $600.00 could be deleted, because those

---

[7] On Schedule J, Debtors claim their three adult children as dependents.  They ranged in age at the time of the petition from ages 22-26, though only their 24 year old son was living with them.  Debtors did not list Mr. Decker's mother as a dependent.

insurance premiums were already reflected as a deduction from Mr. Decker's monthly wages. Additionally, the monthly expense for support of Mr. Decker's mother was not accurate. In reality, his mother contributes $500.00 per month towards Debtors' household expenses.[8] The $500.00 expense for her support should actually be counted as income.

The UST also challenged Mr. Decker's voluntary retirement contribution, the monthly retirement loan repayment, and the monthly payment for nondischargeable tax obligations. Debtors have not provided any specifics as to these items. While their Schedule B discloses "Mr. Decker's rights in the retirement plan of the Conoco Phillips [sic]," the nature of that retirement interest is not defined, and no value is provided. Similarly, no evidence was presented regarding the $1,000.00 budgeted for payment of the tax obligation. The court is left at a loss as to whether such payments were actually being made, if they were made pursuant to any agreement, and, if so, the terms of such agreement.

Mrs. Decker further admitted that their scheduled vehicle expenses were overstated. Debtors' Schedule J includes monthly expenses totaling $3,743.00 for vehicles. This amount is comprised of $1,643.00 for "[c]ar payments for vehicle 1," and a separate entry of $2,100.00 for "[t]otal payments, all vehicles." Under examination by her counsel during the hearing, Mrs. Decker conceded that they had double counted the car payments. She agreed that the $2,100.00 amount should be deleted.

Despite this concession, the UST maintains that Debtors still overstate their monthly car payments. Four vehicles are listed on Schedule B: a 2006 Subaru Baja, a 2006 Subaru Impreza, a 2010 Chevrolet HRR, and a 2005 Pontiac Grand Prix. Debtors listed secured

---

[8] Mr. Decker's mother receives separate social security and pension payments.

debts against each of these vehicles.  Mrs. Decker drives the Chevrolet HHR, and testified that she pays about $500.00 per month for the vehicle.  Mr. Decker drives a 2003 or 2004 Ford Escape that has roughly 153,000 miles on the engine.  This vehicle is not listed in Debtors' Schedules.

While Debtors have reaffirmed two of the four vehicle loans, neither of the reaffirmed debts is for the HHR used by Mrs. Decker.  Shockingly, the two loans that were reaffirmed are for vehicles that are not operational.  Mrs. Decker testified that the two Subarus have significant engine problems.  She estimates it would take roughly $5,000.00 to repair each one.  According to the *Reaffirmation Agreements* for these vehicles, Debtors pay $328.00 a month for the Impreza, which has a balance owing of $6,228.49, payable over 16 months.[9] They pay $385.00 per month for the Baja, which had a balance of $2,555.62 owing, payable over six months.[10]  When asked why they would pay over $700.00 per month, and reaffirm more than $8,700.00 in debt, for two non-operational vehicles, Mrs. Decker explained simply that they wanted to preserve their financial relationship with the credit union to whom the debt was owed.  Based upon these *Reaffirmation Agreements*, the UST argues that the only evidence of monthly vehicle payments is the $713.00 attributed to the two Subaru vehicles.[11]

---

[9] *Reaffirmation Agreement* filed May 21, 2014 (ECF No. 24), admitted into evidence as Ex. 2.

[10] *Reaffirmation Agreement* filed May 20, 2014 (ECF No. 22), admitted into evidence as Ex. 1.

[11] The Bankruptcy Code requires Debtors to reaffirm loans secured by vehicles they intend to retain. 11 U.S.C. § 521(a)(2).  The fact that Debtors failed to reaffirm the loans for the HHR, used by Mrs. Decker, or the Grand Prix, but instead reaffirmed loans for two vehicles that no longer run, supports the UST's contention that the vehicle expenses are overstated.  The court further notes that the secured creditor for the Grand Prix is located in Colorado Springs, where Debtors' youngest daughter attended college.  It may be that the Grand Prix is the daughter's vehicle and obligation.

The remaining expenses challenged by the UST pertain to Debtors' three adult children.  Debtors budget $2,025.00 per month for the oldest daughter's care, including rent, utilities, cable television, food and medical expenses.  They also allot $1,000.00 per month for their youngest daughter's school expenses.  At the hearing, however, Mrs. Decker testified that her youngest daughter had just graduated from college, and recently moved to California to start a part-time, entry-level job at a college.  Debtors were helping her find an apartment near work, and Mrs. Decker predicted that they would need to assist her with living expenses for about one year, with the hope that this daughter will ultimately be promoted to a permanent, higher-paying position at the college.  Mrs. Decker also projected that they would need to increase the $1,000.00 monthly allotment for the younger daughter due to the higher cost of living in California.  She did acknowledge that her youngest daughter was healthy and might find a full time job that paid more.  But, she also noted that both her son and youngest daughter were dyslexic.  Mrs. Decker believes that this places some limitations on their job prospects.  Both her son and youngest daughter have at least $60,000.00 in student loans.

### D.    Post-Testimony Arguments by the Parties.

After hearing Mrs. Decker's testimony, the UST argued that Debtors' own revisions to their budget showed that they could fund a plan that would pay between $214,000.00 to $420,000.00 to their creditors over five years.  First, by disallowing Mr. Decker's voluntary retirement contribution of $1,632.00, Debtors' combined monthly income would increase from $17,453.00 to $19,085.00.  The UST suggested Debtor's monthly expenses could also be adjusted by: 1) reducing their vehicle loan payments from $3,743.00 to $713.00 as

indicated on the *Reaffirmation Agreements*, 2) removing the health insurance expense of
$600.00 because this amount was already included in Mr. Decker's payroll deductions, 3)
removing the itemized $500.00 monthly expense for the mother and *adding* that sum instead
to Debtors' income, based on Mrs. Decker's testimony that the mother contributed this
amount to the household, and 4) removing the $1,000.00 payment for nondischargeable taxes
and the $1,000.00 support payment for the youngest daughter.  These adjustments would
reduce monthly expenses by $6,630.00.  Thus, even allowing Debtors' support payment for
their oldest daughter ($2,025.00) *and* the retirement loan repayment ($1,205.00), the UST
projected that Debtors would have roughly $8,050.00 in net monthly income to devote to
paying their creditors.  Alternatively, if these two items are not allowed, Debtors' total
monthly expenses would decrease to $9,427.32, thereby generating monthly disposable
income of $11,362.34.[12]

## DISCUSSION

The UST seeks conversion of Debtors' case to chapter 11 under § 706(b), which
succinctly provides that, "[o]n request of a party in interest and after notice and a hearing,
the court may convert a case under this chapter to a case under chapter 11 of this title at any
time."[13]  As the movant, the UST has the burden of establishing that the case should be
converted to chapter 11.[14]  She argues that because § 706(b) does not include any
requirements or standards for conversion, the court has the discretion to convert this case

---

[12] See the detailed calculation of monthly net income attached as Exhibit A.

[13] 11 U.S.C. § 706(b).

[14] *In re Hardigan*, 490 B.R. 437, 445 (Bankr. S.D. Ga. 2013), *aff'd* 517 B.R. 379 (S.D. Ga. 2014)
(citing *In re Ryan*, 267 B.R. 635, 639 (Bankr. N.D. Iowa 2001)).

over Debtors' objection and without consideration of other competing factors.  In short, the UST argues that because Debtors have an ability to pay their creditors, their chapter 7 proceeding should be converted to chapter 11 under § 706(b).  Debtors vigorously oppose the motion, and argue that the UST is impermissibly attempting to import the means test contained in § 707(b) to compel conversion of non-consumer, individual debtors under the separate provisions of § 706(b).  They characterize the relief sought as a radical departure from settled law that has historically rejected compelled involuntary reorganizations.

### A.      Section 706(c) Permits the Involuntary Conversion of a Debtor to Chapter 11.

Under the straightforward language of § 706(b), the court may convert a chapter 7 proceeding to chapter 11 at any time.  Unlike dismissal under § 707(a), or dismissal or conversion under § 707(b), conversion under § 706(b) is not conditioned upon any specific factors, or limited to any subset of debtors.[15]  Rather, conversion under § 706(b) is committed to the sound discretion of the court.[16]

Debtors urge the court to adopt a more restrictive reading of § 706(b), and anchor their opposition upon a line of cases that have declined to force an unwilling individual debtor to convert from chapter 7 to chapter 11.  This line of cases is exemplified by *In re Graham*,[17] a case with factual parallels to the Deckers' situation.  Dr. Graham was a 59 year old

---

[15] *Compare* 11 U.S.C. § 707(a) (dismissal for cause) and § 707(b) (governing dismissal or voluntary conversion of cases involving debtors with primarily consumer debts).  *See also* 11 U.S.C. § 1112(b) (dismissal or conversion for cause) and § 1307(c) (same).

[16] *Matter of Johnson*, 116 B.R. 224, 225-26 (Bankr. D. Idaho 1990) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 380 (1977); S. Rep. No. 989, 95th Cong., 2nd Sess. 94 (1978), U.S. Code Cong. & Admin News 1978, pp. 5787, 5880, 6336)).

[17] *In re Graham*, 21 B.R. 235, 237 (Bankr. N.D. Iowa 1982).

10

radiologist who earned significant income.  He filed his chapter 7 petition to address a number of claims resulting from his divorce, including a sizable IRS priority tax debt.  His ex-wife moved under § 706(b) to convert his case to chapter 11, and the debtor opposed conversion.  Dr. Graham argued that between monthly living and business expenses, and his required payments to the IRS, he would have very little left to pay unsecured creditors.  He also indicated his desire to limit his business hours in the future, which would further reduce any potential for payments to his creditors.

The court noted the inherent tension between the creditors' interest to maximize their recovery and the debtor's strong interest to receive an immediate discharge of his debts.  To resolve the question, the court searched for "legislative intent on the question whether individual debtors should be forced into repayment plans against their will."[18]  The legislative history specific to the enactment of § 706(b) was very limited; it provides only that "[t]he decision whether to convert is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest."[19]  To ascertain Congress' philosophy on involuntary conversions, the court instead relied upon the legislative history underlying the voluntary nature of chapter 13.  That legislative history revealed that Congress considered an involuntary chapter 13 "unwise," because "[a]n unwilling debtor is less likely to retain his job or to cooperate in the repayment plan, and more often than not, the plan would be

_____

[18] *Id*. at 238.

[19] Id. at 237 (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 380 (1977); S. Rep. No. 989, 95th Cong. 2d Sess. 94 (1978), U.S. Code Cong. & Admin. News 1978, pp 5787, 5880, 6336); *see also Matter of Johnson*, 116 B.R. at 225 (citing legislative history).

11

preordained to fail."[20]   Although this statement was addressed to mandatory chapter 13 proceedings, the court in *Graham* applied it by analogy to § 706(b), finding it an "unequivocal statement of congressional intent on the question whether individual debtors should be compelled to submit to a repayment plan."[21]   The court, therefore, refused to compel Dr. Graham to reorganize within chapter 11.[22]

A number of other courts, following the rationale stated in *Graham*, have also denied § 706(b) motions in individual debtor cases.[23]   Additionally, prior to 2005, other courts faced with motions to convert under § 706(b) concluded that it would be futile to convert to chapter 11 because an individual debtor's postpetition wages were not property of the bankruptcy estate.   Courts could not, therefore, require unwilling debtors to devote their postpetition wages to fund a plan of reorganization.[24]

---

[20] *In re Graham*, 21 B.R. at 238.   The court noted that Congress had also raised concerns that a mandatory chapter 13 could violate the Thirteenth Amendment's prohibition against involuntary servitude. *Id.* (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 120 (1977);U.S. Code Cong. & Admin. News 1978, p. 6080 (footnotes omitted)).   The *Graham* court expressed some doubt as to whether "Congress was correct in its assessment of the constitutional issue allegedly involved in a mandatory repayment plan under the Bankruptcy Code."   *Id.*   The debtors allude to similar concerns, but fail to develop such an argument.

[21] *Id.* at 239 n.6.

[22] *Id.*

[23] *See In re Ryan*, 267 B.R. 635 (Bankr. N.D. Iowa 2001); *In re Freunscht*, 53 B.R. 110, 112 (Bankr. D. Vt. 1985)(Congress intended § 707(b) to apply only to debtors doing business; individual debtors could not be compelled to submit to a repayment plan); *In re Brophy*, 49 B.R. 483, 484 (Bankr. D. Hawai'i 1985) (court agreed with *Graham* and found that § 707(b) "was not intended to be a vehicle by which individual debtors would be forced to submit to a plan of repayment against their will."); *but see In re Lenartz*, 2001 WL 35814401 at*1 (Bankr. D. Idaho May 3, 2001) (holding that the plain language of § 706(b) authorized conversion of an individual debtor to chapter 11 over his or her objection).

[24] *In re Lenartz*, 263 B.R. 331, 335 (Bankr. D. Idaho 2001); *see also Fitzsimmons v. Walsh (In re Fitzsimmons)*, 725 F.2d 1208, 1210-11 (9th Cir. 1984)(debtor's earnings are not property of the estate in chapter 11).

12

Debtors acknowledge that the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")[25] drastically undermined the foundation of *Graham* and its progeny. BAPCPA's amendments to the Bankruptcy Code limited access to chapter 7 by requiring consumer debtors with incomes above the applicable mean income to reorganize, rather than liquidate, to obtain a discharge of their debts.[26] Chapter 7 consumer debtors who run afoul of this "means test" may either dismiss their case, or convert it to chapter 13 or chapter 11. However, consumer debtors are no longer entitled to a discharge within chapter 7 if it would result in an abuse of the bankruptcy process.[27]

Under BAPCPA, Congress also amended the Bankruptcy Code to revise the treatment of individuals in chapter 11. An individual debtor's postpetition earnings are now property of the chapter 11 bankruptcy estate.[28] Upon objection of any allowed unsecured creditor, an individual chapter 11 debtor seeking confirmation of his or her plan must provide his or her projected disposable income over a five year period.[29]

Notwithstanding these changes, Debtors urge the court to recognize what they believe is a clearly expressed congressional policy against forcing individual debtors into involuntary repayment plans. They rely heavily upon § 706(c), which prohibits conversion from chapter 7 to chapter 13 without the consent of the debtor. However, the UST is not seeking

---

[25] Pub. L. No. 109-8, 119 Stat. 23 (April 20, 2005).

[26] 11 U.S.C. § 707(b)(1).

[27] *Id.*

[28] 11 U.S.C. § 1115(a)(2).

[29] 11 U.S.C. § 1129(a)(15). This provision essentially wraps the means test into an individual chapter 11 case to "help ensure that debtors who can pay creditors do pay them." *In re Baker*, 503 B.R. 751, 757 (Bankr. M.D. Fla. 2013).

conversion to chapter 13.[30]  She instead relies upon a separate subsection, § 706(b), that has never included a similar restriction upon conversion of a case to chapter 11

Even prior to BAPCPA, not all courts agreed with the rationale of *Graham*.  In *In re Lenartz*,[31] a creditor sought to convert an individual debtor's chapter 7 case to chapter 11 pursuant to § 706(b).  The debtor relied upon *Graham* for the proposition that the creditor could not compel his conversion to chapter 11.  The court disagreed with the result reached by *Graham* as contrary to the plain meaning of the statute.[32]  Under a literal reading, § 706(b) made no distinction between individual and business debtors.  The court also queried why Congress would permit creditors to initiate an involuntary chapter 11 proceeding against an individual debtor, under § 303(b), if it intended that only business debtors could be forced into chapter 11 under § 706(b).[33]  The court concluded that, under appropriate circumstances, it could convert an individual debtor's case to chapter 11.[34]

As to whether such a result was unintended, the court in *Lenartz* noted that "Congress has had ample opportunity since *Graham* pointed out this 'problem' in 1982 to amend the statute."[35]  Obviously, Congress has since amended the Bankruptcy Code to require that above median, consumer debtors seeking to discharge their debts do so through

---

[30] It appears, however, that debtors may qualify for chapter 13 under 11 U.S.C. § 109(e) from their Schedules.

[31] 2001 WL 35814401 (Bankr. D. Idaho May 3, 2001)

[32] *Id.* at *2.  ("To the extent that *Graham, Brophy* and *Freunscht* attempt to ignore the plain language of Section 706(b) in favor of implementing an intent by Congress not made explicit in the statutes, this Court must respectfully disagree with those decisions.")

[33] *Id.* at *2-3.

[34] *Id*. at *3.

[35] *Id*. at *2.

14

reorganization under either chapter 11 or 13.   As discussed above, BAPCPA also made significant changes for individuals in chapter 11, none of which make a distinction between individual debtors with primarily consumer debts and those debtors with primarily non-consumer debts.   These statutory changes only serve to buttress the plain meaning of § 706(b), which was not amended.  The court, therefore, agrees with the conclusion reached in *Lenartz*; the plain language of § 706(b) permits the involuntary conversion of any chapter 7 debtor to chapter 11 in the exercise of the court's discretion.

## B.    Is Conversion to Chapter 11 in the Best Interests of the Parties?

When § 706(b) was enacted, Congress intended  that "[t]he decision whether to convert is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest."[36]  Given this open ended standard, courts should "consider anything relevant that would further the goals of the Bankruptcy Code."[37]  As *Graham* and other courts have recognized, these goals are inherently at odds with each other.[38]  While creditors seek to maximize their recovery,[39] debtors understandably seek to discharge their

---

[36] *Matter of Johnson*, 116 B.R. at 225-26 (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 380 (1977); S. Rep. No. 989, 95th Cong., 2nd Sess. 94 (1978), U.S. Code Cong. & Admin News 1978, pp. 5787, 5880, 6336)).  *See also Texas Extrusion Corp. v. Lockheed Corp. (Matter of Texas Extrusion Corp.)*, 844 F.2d 1142, 1161 (5th Cir. 1988); *Schlehuber v. Fremont Nat'l Bank & Trust Co. (In re Schlehuber)*, 489 B.R. 570, 573 (B.A.P. 8th Cir. 2013), *aff'd* 558 Fed.Appx. 715 (8th Cir. 2014); *In re Snyder*, 509 B.R. 945, 955 (Bankr. D.N.M. 2014); *In re Hardigan*, 490 B.R. at 445; *In re Baker*, 503 B.R. at 755; *In re Ryan*, 267 B.R. at 637; *In re Graham*, 21 B.R. at 237.

[37] *In re Lobera*, 454 B.R. 824, 854 (Bankr. D.N.M. 2011); *In re Schlehuber*, 489 B.R. at 573; *In re Baker*, 503 B.R. at 755; *Proudfoot Consulting Co. v. Gordon (In re Gordon)*, 465 B.R. 683, 692 (Bankr. N.D. Ga. 2012).

[38]  *In re Graham*, 21 B.R. at 238; *see also In re Lobera*, 454 B.R. at 854; *In re Schlehuber*, 489 B.R. at 575.

[39] *In re Lobera*, 454 B.R. at 854 (quoting *Toibb v. Radloff*, 501 U.S. 157, 163, (1991)).

debts as quickly as possible in furtherance of their fresh start.[40]  The language of § 706(b) does not require a balancing of interests to convert the case.[41]  Yet, courts have historically considered these competing interests in furtherance of responsibly exercising their discretion.[42]

The UST relies upon Debtors' ability to pay as the "central factor" favoring conversion.  Debtors argue that consideration of this factor is inappropriate because it would effectively incorporate the means test, which Congress specifically limited to consumer debtors under § 707(b).  The UST has not offered an analysis of how conversion might benefit Debtors in this instance.  Debtors contend they would be harmed by having to pay their creditors within a plan, but provide no specifics as to why such harm will occur.  While conversion may not be what they want, the court must look to other considerations in determining whether conversion is in the best interests of all parties, including Debtors.

### 1.    Benefits to the Creditors.

As one court has recently observed, "[a] debtor's ability to pay typically is a starting point in the [§ 706(b)] analysis . . . since the whole reason for asking a case to be converted is the assumption that creditors would receive more in a chapter 11 than in a chapter 7."[43]

---

[40]  *In re Graham*, 21 B.R. at 238.

[41]  *Contrast* 11 U.S.C. § 707(b)(3) (courts may consider totality of the circumstances); § 1112(b)(1) and § 1307(c) (courts may convert or dismiss a case, whichever is in the best interests of the creditors and estate).

[42]  *In re Baker*, 503 B.R. at 755; *In re Gordon,* 465 B.R. at 692; *In re Graham*, 21 B.R. at 238.

[43]  *In re Peterson*, 524 B.R. 808, 815 (Bankr. S.D. Ind. 2015); *see also In re Gordon*, 465 B.R. at 692-93 ("The cases considering conversion to Chapter 11 begin the analysis with the acknowledgment that the debtor can pay more in a Chapter 11 case than in a Chapter 7 case, which is a benefit to creditors."); *In re Schlehuber*, 489 B.R. at 574 ("The Debtor's ability to fund a Chapter 11 plan if he chooses to do so was certainly an important and relevant consideration.").

16

Yet, Debtors contend that such an examination is limited to consumer debtors, and only as part of an examination under § 707(b). As non-consumer debtors, they reason that Congress excepted them from any examination as to their ability to pay when it limited application of the means test to consumer debtors under § 707(b).

Post-BAPCPA, at least one court has held that the more comprehensive provisions of § 707(b) limit the permissible scope of analysis under § 706(b). In *In re Hardigan*,[44] a 60 year old cardiologist filed his chapter 7 petition to discharge personal and business debts estimated to be between $1,200,000.00 and $2,617,912.04. His debts were found to be primarily consumer debts, but he "passed" the means test so that the presumption of abuse did not arise under § 707(b)(3). Dr. Hardigan's lender and the UST sought to dismiss the bankruptcy as an abusive filing under § 707(b)(3), or to convert the case under § 706(b). The court found that Dr. Hardigan had filed his bankruptcy in good faith for purposes of § 707(b)(3)(A). It also examined the totality of circumstances of his financial situation, including his ability to pay his creditors. Although the debtor had an ability to pay, the court found no evidence of misconduct on his part in seeking bankruptcy relief. Absent a showing of misconduct, the court concluded that the debtor's ability to pay was, by itself, insufficient to warrant dismissal for abuse under § 707(b)(3)(B).[45] The court then noted that the movants had relied upon the same body of evidence in support of their alternative basis for relief, conversion under § 706(b). It concluded that, while both §707(b) and § 706(b) applied to Dr. Harding as a consumer debtor, the more specific provisions of § 707(b) restricted its analysis under § 706(b):

---

[44] 490 B.R. 437 (Bankr. S.D. Ga. 2013).

[45] *Id*. at 459.

17

> Because § 707(b) is the more comprehensive of the two, § 707(b) should be used exclusively for deciding conversion issues when the issue is bad faith or abuse. All that remains under § 706 for a consumer debtor is whether a discretionary conversion is warranted for reasons other than those that fit into the body of law interpreting bad faith and abuse under § 707(b).[46]

The *Hardigan* court found insufficient evidence to warrant conversion, and that the movants had failed to establish that conversion would benefit all parties. On appeal, the district court affirmed the bankruptcy court's decisions under both § 707(b) and § 706(b), although it chose not to address the relationship between the two sections as defined by the bankruptcy court.[47]

Here, the Deckers' efforts to preclude an examination into their ability to pay are unavailing. Even under *Hardigan*, the ability to pay is an appropriate factor to consider in this case because Debtors are not consumer debtors and, thus, § 707(b) does not apply. More importantly, conversion of a case under § 706(b) is committed to the sound discretion of the court. Thus, courts may consider a multitude of factors, depending upon the circumstances of each case, to assess the benefits of conversion to all parties. The ability to pay, by itself, is not determinative under § 706(b), but there is nothing within the statute that precludes its consideration.[48] It is an exceedingly relevant, if not necessary, factor and the obvious starting point for any analysis under § 706(b).

---

[46] *Id*. at 446. A series of bankruptcy decisions from New Mexico have similarly held that where the movants fail to establish cause to dismiss under § 707(a), "the Court will not do indirectly what Movant has failed to show should be done directly." *In re Snyder*, 509 B.R. 945, 955 (Bankr. D.N.M. 2014); *see also In re Quinn*, 490 B.R. 607, 621-22 (Bankr. D.N.M. 2012); *In re Lobera*, 485 B.R. at 854. *See, generally, RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, __ U.S. __, 132 S.Ct. 2065, 2071-72 (2012).

[47] *Gebhardt v. Hardigan (Matter of Hardigan)*, 517 B.R. 379, 384 n.1 (S.D. Ga. 2014).

[48] *In re Schlehuber*, 489 B.R. at 574 ("Nothing in § 706(b) suggests that a court may not focus on ability to pay under that section where the Debtor is an individual with primarily business debts.")

18

In this instance, Debtors clearly have an ability to pay. Their schedules show monthly income net of deductions of $17,452.43, and expenses totaling $17,582.32, for a negative monthly balance of $129.89. However, Mrs. Decker conceded that their schedules overstated their expenses by at least $3,200.00. Specifically, the Deckers overstated: 1) their vehicle expenses by $2,100.00, 2) health insurance premiums of $600.00, and 3) support obligations of $500.00 for Mr. Decker's mother. This support obligation is, in fact, additional income to the Deckers because the mother, who lives with them, pays this amount monthly to contribute to household expenses. Debtors also improperly deduct $1,000.00 per month in voluntary payments on prepetition tax debt. Adjusting these monthly expenses raises their disposable monthly net income to at least $4,500.00.[49]

This analysis ignores the more difficult issues raised by Mr. Decker's voluntary retirement contributions ($1,632.19), his retirement loan repayment ($1,205.04), and Debtors' continued support for their adult children ($3,025.00). A factual question also remains as to exactly how much the Deckers are spending monthly on vehicle loan payments. While they claim this figure is $1,643.00 per month, the only vehicle payments that were corroborated during the hearing were the $713.00 paid monthly for the two non-operational Subaru vehicles. This suggests that Debtors' total vehicle payments are still overstated, and that they may have another $900.00 of additional disposable monthly income. While it is unnecessary to determine the exact amount of Debtors' monthly disposable income within this context, the court finds they clearly have an ability to pay between $4,500.00 and

---

[49] If the original negative net monthly balance of $129.00 shown on Schedule I is adjusted by the total of these overstated expenses and the understated income of $4,700.00, Debtors have positive monthly net income of $4,570.11.

19

$11,200.00 per month into a plan. Even at the lower end of the calculation, $4,500.00 in monthly plan payments would generate $270,000.00 over the course of a five-year plan.

The ability to pay creditors is meaningless, however, if a debtor does not have the ability to successfully reorganize. The *Gordon* court canvassed other decisions applying § 706(b), and observed that courts, in exercising their discretion, have also considered: 1) whether there was cause for the immediate dismissal or reconversion of the case under § 1112(b) that would render conversion to chapter 11 a "futile and wasted act," 2) the possibility that the debtors could propose a confirmable plan, and 3) the purpose of conversion, noting that if the sole purpose of converting the case to chapter 11 was to liquidate a debtor's estate, chapter 7 might be more appropriate.[50] Importantly, with all of these considerations, the goal remains to determine the benefit to all parties given the circumstances of the case.[51]

Debtors say that, if this case is converted, Mr. Decker would simply retire and walk away from his job. They would then live off of their considerable retirement income, which is exempt from the creditors' reach. The court construes this as an argument that any conversion to chapter 11 would be futile, or, alternatively, that there is no possibility of a confirmable plan because Debtors will not agree to pay their creditors. It is not persuaded by this scenario. Debtors have failed to explain why they cannot propose and fund a confirmable plan of reorganization that would pay their creditors other than to state that they do not want to do so. They do not deny that Mr. Decker is currently employed and earns

---

[50] *In re Gordon*, 465 B.R. at 692; *see also In re Hardigan*, 490 B.R. at 446.

[51] *In re Gordon*, 465 B.R. at 692.

20

sufficient wages that could, together with their retirement income, fund a viable plan.[52]  Nor do they contest that reorganization would benefit all creditors.  In contrast, as a chapter 7 case, Debtors have no non-exempt assets with which to pay creditors.  Finally, in this case there is nothing to indicate that, should this case be converted to chapter 11, cause would arise under § 1112(b) that would necessitate immediate reconversion or dismissal.[53]  In sum, Debtors have an ability to pay, and conversion under § 706(b) would maximize the estate, providing a benefit to creditors.

### 2.    Benefits to Debtors.

A determination of whether involuntary conversion to chapter 11 would benefit Debtors presents a more difficult analysis.  The Deckers argue that it is unreasonable to compel them to make payments to their creditors for the next five years, particularly at this stage of their lives.  At least two courts have declined to convert chapter 7 debtors to chapter 11 under § 706(b) based upon concerns that to do so could trap the debtors in a reorganization that they did not want or need.[54]  In both cases, the courts were concerned that debtors would be unable to seek reconversion under § 1112(a) due to the prior conversion under § 706(b).  But, Debtors are also parties in interest under § 1112(b), and in appropriate

---

[52]  Debtors also argue that they should not be required to contribute their exempt retirement income to pay their creditors.  It is well settled that exempt income, including retirement income, must be included in the calculation of the a debtor's monthly disposable income.  *In re Terzo*, 502 B.R. 553, 558 (Bankr. N.D. Ill. 2013)("However, pensions are included the calculation even if they are otherwise exempt because the definition of 'current monthly income' is specifically defined as income received 'from all sources.'"); *In re Briggs*, 440 B.R. 490, 495 (Bankr. N.D. Ohio 2010).

[53]  *See, generally, In re Gordon*, 465 B.R. at 692.

[54]  *In re Lobera*, 454 B.R. at 854-55; *In re Hardigan*, 490 B.R. at 446 n 6.  In both cases the courts also conducted thorough analyses under § 707.

21

circumstances, the court would have the discretion to convert the case back to chapter 7, or dismiss the case, under that subsection.[55]

Debtors' opposition to conversion does not preclude the court from considering whether they will nonetheless benefit from a chapter 11 proceeding.[56] This evaluation is part of the overall analysis as to whether conversion benefits *all* parties. In *In re Gordon,*[57] the debtor filed for chapter 7 after entry of a large judgment against him and in favor of his former employer. Mr. Gordon had net monthly income ranging from $3,400.00 to as much as $10,000.00, and his former employer moved to convert the case to chapter 11 under § 706(b). Based upon the estimated range of monthly net income, the court concluded that conversion would benefit Mr. Gordon's creditors. Similar to the instant case, Mr. Gordon argued that conversion was not in his best interests. The court considered the circumstances of the case, and concluded that Mr. Gordon had become "a pawn between two companies which have seen fit to manipulate this Debtor and ruin his credit, rather than resolve their issues."[58] Moreover, the court observed that conversion to chapter 11 would allow the debtor to avoid discharge issues under § 727. Recognizing that the debtor clearly needed a final resolution of the employment disputes between his former and current employers, the court

---

[55] 11 U.S.C. § 1112(b). See also *In re Baker*, 503 B.R. at 759 ("For purposes of section 1112(b)(1), a debtor is a party in interest."); *In re Gordon*, 465 B.R. at 698.

[56] *In re Schlehuber,* 489 B.R. at 575-76.

[57] *Proudfoot Consulting Co. v. Gordon* (*In re Gordon),* 465 B.R. 683, 692 (Bankr. N.D. Ga. 2012).

[58] *Id.* at 694.

concluded that reorganization through chapter 11 would limit the ongoing litigation and was the "preferred method for dealing with payment of the debt."[59]

In another recently decided case, *In re Baker*,[60] the debtor owed over $1 million to the IRS. Much like the Deckers, the IRS held various secured, priority, and general unsecured claims against Ms. Baker, also a medical doctor. As a result, she faced nondischargeability issues under § 523(a)(1)(A). As in *Gordon*, the court in *Baker* concluded that conversion to chapter 11 would benefit the debtor because it would provide a means to address the claims that had been asserted against her.[61] Specifically, Dr. Baker's nondischargeable, priority tax debt could be dealt with through a plan of reorganization, which would allow her to pay the tax claims over a five year term.[62] Despite the debtor's opposition, the court concluded that conversion under § 706(b) would provide a sufficient benefit to the debtor to warrant conversion.

The court finds the Deckers' situation analogous to both *Gordon* and *Baker*. First, as in *Gordon*, there is an ongoing dispute with a creditor. Debtors owe more than $200,000.00 to the IRS, due to the under-reporting of their income for almost a decade. Unfortunately, they have been unable, or unwilling, to resolve this problem. Instead, they have continued to annually accrue additional tax liabilities, including taxes assessed in 2014. The substantial amount of federal taxes, and the inherent nondischargeability issues raised by § 523(a)(1)(A), brings Debtors' situation within the purview of *Baker*. While they have filed bankruptcy to

---

[59] *Id.*

[60] *In re Baker*, 503 B.R. 751 (Bankr. M.D. Fla. 2013).

[61] *Id* at 758.

[62] 11 U.S.C. § 1129(a)(9)(C)(ii).

obtain a fresh start, they cannot truly achieve this objective until they resolve their tax liabilities to the IRS.

No evidence or analysis was presented at the hearing regarding the dischargeability of this tax debt.  The IRS asserts a secured tax claim of $17,281.98, and a priority claim under § 507(a)(8) for $95,929.52.  The priority portion of the tax claim is presumably nondischargeable under § 523(a)(1).  In their Schedule J, Debtors allocate $1,000.00 per month for prepetition tax debt, presumably to pay the IRS.  Yet, no evidence was presented on this subject either, leaving the court to speculate whether such payments are pursuant to an arrangement with the IRS, or are even meaningful in the context of breaking free of this debt and obtaining a fresh start.

As recognized in *Baker,* chapter 11 affords Debtors the means to address this longstanding debt.  As already noted, even at the lower range of projected disposable income, Debtors would have $4,500.00 per month to pay into a plan of reorganization.  Over five years, this would generate $270,000.00 in plan payments.  This amount is sufficient to pay the secured and priority components of the IRS claim, leaving over $150,000.00 for payments to unsecured debts.[63]  Even if the increased administrative expenses inherent to chapter 11 are factored into this calculation, there would still be a significant return to unsecured creditors.  And, under this scenario, Debtors would retain the ability to continue to support their adult children.  The exact terms of any plan obligations would depend upon negotiations with the IRS and other creditors.  Yet, it is clear that Debtors would have the ability within a chapter 11 to resolve financial problems that would otherwise remain after

---

[63] The fact that conversion would benefit more than the debtor's primary creditor was also significant to the court in *In re Gordon*, 465 B.R. at 693.

24

a chapter 7 discharge.  In other words, conversion may not give Debtors immediate relief, but could ultimately result in a better fresh start.  Conversion to chapter 11 provides Debtors with an actual benefit because it affords them the means to resolve a longstanding debt which is likely to be at least partially nondischargeable.

## CONCLUSION

If Debtors had primarily consumer debts, § 707(b) would require them to reorganize and pay their disposable income to their creditors within a chapter 11 or 13 proceeding in exchange for discharging their debts.  However, the Deckers do not qualify as consumer debtors, and are excepted from the requirements of the means test, in large part because they have failed to pay their taxes.  Over the nine years prior to the bankruptcy filing, their tax liability has grown to the point that it now comprises the majority of their liabilities.  As a result, they were qualified to file their bankruptcy under chapter 7.

As the cases attest, courts exercising their discretion to convert individual chapter 7 debtors to chapter 11 have reached differing results.  For the reasons stated above, this case is much closer to *Gordon* and *Baker*, than *Hardigan* and *Lobera*.  The Deckers have materially overstated their monthly expenses.  As a result, they have monthly disposable income with which they can fund a plan that would pay their creditors more than would be received within the chapter 7 case.  A chapter 11 will maximize recovery not only for the IRS, but for all creditors.   Given their ongoing, sizeable, and at least partially nondishargeable, tax problems, reorganization provides the Deckers with a viable means to finally resolve their debts in an orderly fashion so that they may achieve a realistic fresh start.

25

While Debtors do not want to reorganize, their situation suggests that there is a benefit to doing so which distinguishes this case from *Lobera*.  Nor are Debtors necessarily trapped within chapter 11 as the court retains the discretion to address that situation under § 1112(b).

Therefore, the UST's *Motion* will be granted.  However, it appears that Debtors may qualify for chapter 13 relief, which would provide them with a more streamlined and economical option for reorganization.  As discussed above, pursuant to 11 U.S.C. § 706(c) the court cannot compel conversion to chapter 13, but it will defer entry of its conversion order for a period of two weeks to give Debtors the option to elect to convert to chapter 13, should they choose to do so.  Otherwise, the court will enter a separate order converting the case to chapter 11 on April 16, 2015.

DATED: March 31, 2015.


BY THE COURT

 /s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge


Serve:  R. Crowther, Esq. (for debtors)
        T. Buford, Esq. (for U.S. Trustee)
        L. Compton, Trustee
        U. S. Trustee

26

**Exhibit A**
**Summary of Monthly Income and Expenses**

|  | Debtors | UST |
|---|---|---|
| Monthly Income |  |  |
| Gross | $ 13,587.09 | $ 13,587.09 |
|  |  |  |
| Tax, Medicare, and Social Sec. | $ (3,278.20) | $ (3,278.20) |
| Voluntary contrib. to retirement | $ (1,632.19) |  |
| Insurance | $ (317.91) | $ (317.91) |
| Retirement Loan Repayment | $ (1,205.04) |  |
| Net of Monthly Deductions | $ 7,153.75 | $ 9,990.98 |
|  |  |  |
| Monies from Mother |  | $ 500.00 |
| Pension/Retirement | $ 10,298.68 | $ 10,298.68 |
| Total Monthly Income Net of Deductions | $ 17,452.43 | $ 20,789.66 |
|  |  |  |
| Monthly Expenses |  |  |
| House | $ 2,900.00 | $ 2,900.00 |
| Real Estate Taxes | $ 50.00 | $ 50.00 |
| Home Maintenance | $ 200.00 | $ 200.00 |
| Electricity/Heat | $ 550.00 | $ 550.00 |
| Water/Sewer | $ 130.00 | $ 130.00 |
| Telephone | $ 480.00 | $ 480.00 |
| Food | $ 1,000.00 | $ 1,000.00 |
| Clothing | $ 300.00 | $ 300.00 |
| Personal | $ 100.00 | $ 100.00 |
| Medical and Dental | $ 300.00 | $ 300.00 |
| Transportation | $ 1,000.00 | $ 1,000.00 |
| Recreation | $ 150.00 | $ 150.00 |
| Insurance |  |  |
| Health | $ 600.00 |  |
| Auto | $ 350.00 | $ 350.00 |
| Installment |  |  |
| Auto | $ 1,643.00 | $ 713.00 |
| Total Payments, All Vehicles | $ 2,100.00 |  |
| Payment on Nondischargeable Tax Debts | $ 1,000.00 |  |
|  |  |  |
| Other Payments: |  |  |
| Support-Oldest Daughter | $ 2,025.00 |  |
| Support-Youngest Daughter/Mother | $ 1,500.00 |  |
|  |  |  |
| Tax& Ins Deductions from Retirement | $ 1,204.32 | $ 1,204.32 |
| Total Expenses | $ 17,582.32 | $ 9,427.32 |
| NET INCOME | $ (129.89) | $ 11,362.34 |

27